UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID DEJESUS,**<br><br>       **Plaintiff,**<br><br>       v.<br><br>**WP COMPANY LLC d/b/a THE WASHINGTON POST,**<br><br>       **Defendant.** | **Civil Action No. 13-1101 (JDB)** |

## MEMORANDUM OPINION

David DeJesus was a successful ad seller at the Washington Post. But according to his supervisor, he was also insubordinate. And when he delivered a study to the wrong client, she set his termination in motion. Believing that his supervisor had discriminated against him on the basis of his race and age, DeJesus sued. But because he has failed to demonstrate a triable issue on the reasons for his termination, the Court will grant the Post's motion for summary judgment.

## BACKGROUND

DeJesus, a sixty-three-year-old African-American man, has worked in advertising sales at the Post since 1993. Def.'s Ex. 10 [ECF No. 36-11] at 9, 11.[1] During his tenure at the Post, DeJesus was responsible for accounts worth millions, and won more than forty awards. See Pl.'s Ex. 6 [ECF No. 39-2] at 189, 191. Despite his success, however, at least one manager has suggested that he had communication issues. See Def.'s Ex. 20 [ECF No. 36-20] at 3.

Then, in 2008, he began reporting to Noelle Wainwright. See Def.'s Ex. 4 [ECF No. 36-5] at 3. Their professional relationship was particularly difficult: Wainwright complained of

---

[1] For the purposes of this opinion, citations to the parties' exhibits use the pagination provided by the CM/ECF stamp on the docket entry.

DeJesus's "overall lack of sales professionalism, lack of focus, lack of proper sales call preparation, and lapse in communication skills, both internally and with clients." Def.'s Ex. 7 [ECF No. 36-8] at 2. Wainwright criticized DeJesus for a number of incidents over the years, and certain aspects of his performance reviews suffered. See, e.g., Def.'s Ex. 3 [ECF No. 36-4] at 6 (rating DeJesus in his 2008 performance appraisal as "below standards" in time management and taking the initiative); Def.'s Ex. 23 [ECF No. 36-23] at 12 (noting in DeJesus's 2010 performance appraisal that "[t]here are cycles where Dave is 'off', falling behind in his follow up with clients and on [o]pportunities," and that "during these cycles, he also tends to make junior mistakes").

The relationship between DeJesus and Wainwright reached its breaking point in 2011. Allstate Insurance Company's advertising agency, Starcom, requested an advertising impact report (known as a "RAM study") regarding a recent ad it had placed in the Post. Because Wainwright was out of the office, DeJesus did not consult with her before ordering the RAM study. See Def.'s Ex. 10 at 26–27. When she learned that he had done so, Wainwright told DeJesus that she "should have been aware of this before [they] decided to move forward," and asked him to "please communicate with [her] on th[o]se types of requests." Def.'s Ex. 6 [ECF No. 36-7] at 3. Wainwright later testified that she had an unwritten policy requiring that all RAM studies be approved by a manager. See Def.'s Ex. 4 at 13. But her explanation is murky. Compare id. at 14 ("It [the policy] was stated. Everybody knew it."), with id. ("I don't know that I ever said it. I don't know that I ever had to."). And, in any event, she ended the e-mail chain by saying "No worries." Def.'s Ex. 6 at 2.

But the saga of the RAM study did not end there. The two had a meeting in which Wainwright explained that "the information [from the study] should be given to the client and not to the agency." Def.'s Ex. 10 at 30. According to Wainwright, she specifically mentioned Karen

2

Hornberger, Allstate's marketing manager. See Def.'s Ex. 4 at 23–24.  But DeJesus says that Hornberger's name never came up. See Def.'s Ex. 10 at 31.  Later, Wainwright reiterated to DeJesus by e-mail her "expect[ation] that [he] only deliver the results [of the RAM study] in person." Def.'s Ex. 14 [ECF No. 36-15] at 3.  She then asked him to confirm that he had set a meeting with "the client" for the next week. Id.  DeJesus agreed, id., understanding "the client" to mean Allstate, see Def.'s Ex. 10 at 30.  According to Wainwright, however, "client" meant something more specific, see Def.'s Ex. 4 at 26—it meant Hornberger, whom DeJesus had met only once before, see Def.'s Ex. 10 at 58–59.  Later in the e-mail chain, Wainwright pointed out again that this meeting should be a priority. Def.'s Ex. 14 at 3.  And DeJesus responded by stating that he was merely waiting for confirmation of a time. Id. at 2.

A few days later, Wainwright followed up, again reminding DeJesus to deliver the RAM study results in person. See Def.'s Ex. 15 [ECF No. 36-16] at 3.  And DeJesus again expressed his understanding of that directive. Id. at 2.  He noted that the "client meeting" was confirmed for June 8. Id.  But that meeting was with Starcom, not Allstate. See Def.'s Ex. 30 [ECF No. 36-30] at 2.  And DeJesus neglected to mention a meeting with Allstate's Vice President for Federal Legislative and Regulatory Affairs, Stacy Sharpe, scheduled to precede it.  He gave the RAM study to Sharpe at that earlier meeting, and met with a positive reaction from her. See Def.'s Ex. 10 at 34.

But when Wainwright found out that DeJesus had presented the RAM study to Sharpe, rather than Hornberger, her reaction was "explosive." Def.'s Ex. 10 at 36.  Wainwright was particularly "angry" that DeJesus had delivered the results to Sharpe because Sharpe lacked budget approval authority, id., even if she "influence[d]" the budget, id. at 35.  In an attempt to "defuse

3

the . . . yelling," DeJesus falsely told Wainwright that he had presented the information to Hornberger as well. Id. at 36. DeJesus retracted that statement later the same day. Id.

An angry Wainwright brought her concerns to her supervisor, Ethan Selzer, and in late June, Wainwright gave DeJesus a proposed separation agreement. A month later, the Post formally terminated DeJesus's employment. The termination memorandum stated the cause as "willful neglect of duty and insubordination," referencing the aftermath of the RAM study. Pl.'s Ex. 51A [ECF No. 39-4] at 140. The memo explained that DeJesus "fail[ed] to follow [Wainwright's] specific instructions regarding the delivery of this already unauthorized RAM study," as he "did not meet with the client," but "only met with their agency and with a local client contact with no advertising decision-making ability or budgetary oversight." Id.

That same day, the Washington-Baltimore Newspaper Guild filed a grievance challenging DeJesus's termination under its collective bargaining agreement with the Post. See Def.'s Ex. 26 [ECF No. 36-26] at 2. Under the terms of that agreement, the grievance was submitted to an arbitrator, who found that the Post had not satisfied its burden of "demonstrat[ing] just and sufficient cause for discharge." Def.'s Ex. 27 [ECF No. 36-27] at 12. Because the Post had not used its progressive discipline procedures, it had to prove "gross misconduct or willful neglect of duty." Id. at 13. Unable to satisfy this "heavy burden," id., the Post was ordered to reinstate DeJesus "to his former or substantially similar position . . . and to make him whole for his losses," id. at 19.

The Post reinstated DeJesus the following month. But he remained unsatisfied. After exhausting his administrative remedies, DeJesus brought suit alleging race discrimination under Title VII and 42 U.S.C. § 1981, as well as age discrimination under the Age Discrimination in

4

Employment Act ("ADEA"). Discovery is now complete, and the Post has moved for summary judgment. See Def.'s Mot. [ECF No. 36].

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate a "genuine dispute," a non-moving party must put forth more than the "mere existence of a scintilla of evidence" to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Indeed, "[b]y pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment." Lester v. Natsios, 290 F. Supp. 2d 11, 20 (D.D.C. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). And the moving party may also succeed where the non-moving party sets out evidence that is "merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249 (citation omitted). But the Court must view all evidence in the light most favorable to the non-moving party, and must draw "all justifiable inferences" in his favor. Id. at 255.

## ANALYSIS

DeJesus's race and age discrimination claims are properly analyzed under the familiar McDonnell Douglas burden-shifting framework. See Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying McDonnell Douglas to an ADEA claim). After a plaintiff establishes a prima facie case of employment discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer does so, the burden shifts again, requiring the plaintiff to demonstrate that the employer's "stated reason . . . was in fact pretext." Id. at 804.

But, as the D.C. Circuit has instructed, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—<u>and should not</u>—decide whether the plaintiff actually made out a prima facie case under <u>McDonnell Douglas</u>." <u>Brady v. Office of the Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the case is reduced to "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race [or age]?" <u>Id.</u> Thus, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

A plaintiff may make the requisite showing by relying on "(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." <u>Holcomb v. Powell</u>, 433 F.3d 889, 897 (D.C. Cir. 2006). Evidence may be direct or circumstantial, <u>Dunaway v. Int'l Bhd. of Teamsters</u>, 310 F.3d 758, 763 (D.C. Cir. 2002), and may include comparative evidence demonstrating that an employer treated otherwise similarly situated employees differently, depending on their race or age; inconsistencies in the employer's explanation of its actions; a failure to follow company procedure; discriminatory statements; or evidence that the employer is lying about the underlying facts of the termination, see <u>Brady</u>, 520 F.3d at 495 & n.3.

DeJesus asks that the Court focus on the rationale contained in his termination memo. See Pl.'s Opp'n [ECF No. 39] at 17. The memo explains that DeJesus was terminated "for willful neglect of duty and insubordination." Pl.'s Ex. 51A at 140. Elaborating further, the memo points out that—despite numerous instructions to the contrary—DeJesus failed to deliver the proprietary data of the RAM study directly to the client. See id. And DeJesus does not contest that, in its essentials, that information is true. DeJesus did meet with Sharpe instead of Hornberger. And Sharpe does lack "budgetary oversight." See id. Thus, Wainwright was entitled to say that DeJesus "fail[ed] to follow [her] specific instructions." Id.

But were these instructions so specific? After all, Wainwright only said "client," not "Hornberger." Hence, one could argue that DeJesus simply misunderstood, thinking that "client" could refer to anyone at Allstate. Even that assumption, however, is not enough to help DeJesus. The Court's inquiry "is not the correctness or desirability of the reasons offered, but whether the employer honestly believes in the reasons it offers." Fischbach v. Dist. of Columbia Dep't of Corr., 86 F.3d 1180, 1183 (D.C Cir. 1996) (internal quotation marks and alterations omitted). In her deposition, Wainwright explained that, for her, "client" meant "Hornberger." See Def.'s Ex. 4 at 26. And Wainwright's "explosive" reaction only buttresses the conclusion that Wainwright intended DeJesus to deliver the results to a specific person—who was not Sharpe. In short, DeJesus simply has not provided evidence to undermine Wainwright's non-discriminatory explanations. See Pignato v. Am. Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." (citation and internal quotation marks omitted)).

DeJesus believes that the arbitral decision, which found in his favor, demonstrates otherwise. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 (1974) ("The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."). But that decision is of little use to him here. The arbitrator evaluated DeJesus's grievance under the terms of his contract: because the Post had failed to use appropriate progressive disciplinary procedures, it had to "prove gross misconduct or willful neglect of duty"—a "heavy burden." Def.'s Ex. 27 at 13. In the arbitration context, "[i]n order to make out an allegation of insubordination, [the Post had to] show that there was: 1) a clear order which was communicated to the employee; 2) notice of the consequences of a failure to follow the order; and 3) evidence that armed with such knowledge the employee willfully refused to obey the order." Id.

Unsurprisingly, the arbitrator found that the Post had not met this burden. As described above, it would be difficult to find that Wainwright gave a "clear order" to deliver the results to Hornberger. See id. at 15. But that finding has little to do with the inquiry before the Court now, where the burden has shifted to DeJesus, and the issue is not the clarity of Wainwright's order, but her own belief in the veracity of the grounds for termination. The arbitration award might be evidence of something—but it does not address the issues now before the Court. See Coleman v. Donahoe, 667 F.3d 835, 854 (7th Cir. 2012) ("[T]he arbitrator ruled that the [employer] lacked just cause to terminate [the plaintiff]. This finding is not the same as a finding that the [employer] decision-makers were lying about their motives.").

DeJesus attempts to bolster his claim by bringing in evidence unrelated to the termination memo. In particular, he complains that Wainwright's other actions "show[] that she pursued a clear path to sabotage [his] employment." Pl.'s Opp'n at 21. But this is an overstatement. For instance, he claims that Wainwright "inexplicably" transferred a large account to a less

experienced employee. See id. But Wainwright does offer an explanation—consolidating accounts by geography to save travel expenses, see Def.'s Ex. 4 at 49–51—that DeJesus has not undermined. No more availing are DeJesus's arguments that Wainwright "intentionally gave false and incomplete information" to a supervisor regarding DeJesus's choice to schedule a meeting at an inopportune time, see Pl.'s Opp'n at 22–23, and that Wainwright failed to investigate the RAM study fiasco before initiating his termination, see id. at 24. All of this evidence may go—to greater or lesser lengths—to showing that Wainwright was a difficult boss, or was not terribly fond of DeJesus, or could have handled the RAM matter better. But it does not move the needle at all regarding the only relevant issues—racism, ageism, or the validity of the Post's proffered explanations for DeJesus's termination.

DeJesus also delves into specific interactions with Wainwright that he believes demonstrate her racial animus. For instance, while she "would fly off the handle at other people," he felt there was "an edginess in her conversation and tone with [him], in particular, that [he] did not see with others." Pl.'s Ex. 3 [ECF No. 39-2] at 103. Wainwright also told DeJesus that he "spoke well" and that "she could see [him] in a capacity as a financial advisor." Id. at 106. And DeJesus felt that Wainwright did not treat African-American clients well, describing one woman as "not a friend of The Washington Post," id. at 108, and not sitting at the same table as Sharpe, who is African American, at a conference event, id. at 109. But these events are hardly evidence of racial animus. Moreover, "stray remarks, even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff." Simms v. U.S. Gov't Printing Office, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000) (internal quotation marks omitted). And there is evidence that Wainwright experienced

friction with white employees as well. See Pl.'s Ex. 14C [ECF No. 42] ¶ 26 (mentioning a "particularly severe fight" between Wainwright and Anna Knapp, who is white).

As to age discrimination, DeJesus relies primarily on the testimony of Mary Kathleen Phillips, a woman in her fifties who also worked for Wainwright. Phillips "felt degraded" at work because Wainwright "berated [her] unnecessarily," and believed that her colleagues—though treated poorly—were not abused "to that extent." Pl.'s Ex. 8 [ECF No. 39-3] at 4. But Phillips never connected this potentially disparate treatment to her age; indeed, she "didn't understand why" Wainwright treated her that way. Id. When asked whether she had any evidence that Wainwright "doesn't like older people," Phillips responded, "She didn't like me. And whether that was because I'm older, I don't know. But I just know how she treated me." Id. at 20. Phillips also mentioned that another man, about her age, had been subject to Wainwright's abrasive demeanor as well. Id. at 12. But the content of Wainwright's tirades seem to be linked to work performance. For instance, Wainwright often screamed at Phillips about her accounts. See id. at 5. None of Phillips's testimony suggests that Wainwright did not sincerely believe what she was saying. The implication that Wainwright was a difficult supervisor for all of her employees, but especially those of middle age, is "merely colorable," Anderson, 477 U.S. at 249; it is not enough to create a genuine issue of material fact regarding the Post's proffered explanation for DeJesus's termination.

Finally, DeJesus points to unrelated events that—he says—demonstrate a pattern of bad behavior at the Post. Duncan Ballantine, a manager at the Post more than ten years ago, spoke to DeJesus "in a very condescending tone." Pl.'s Ex. 3 at 100. And people (whom DeJesus can't recall) told him that Ballantine made "insensitive remarks" (the nature of which DeJesus, again, can't recall). Id. Whitney Patton—a manager eight years ago—"possibly acted in a racially

10

insensitive way." Id. at 148. And twenty years ago, another employee came to the Post wearing a KKK belt buckle, and was not fired. Id. at 133. These incidents—isolated, hazy, and well in the past—do not give rise to an inference that the Post is so overrun by racism that Wainwright, too, must be proffering pretextual reasons for DeJesus's dismissal. See Holcomb, 433 F.3d at 901.[2]

One more piece of evidence bears mentioning. Two weeks after he filed his opposition, DeJesus added an affidavit from former Post employee Arisha Hawkins. See Pl.'s Ex. 14C. The Post has moved to strike the affidavit, arguing that it came too late, and that the Post was not adequately on notice that it should depose Hawkins during discovery. But nothing in Hawkins's affidavit would change the Court's calculus anyway. At first glance, Hawkins describes a tense atmosphere, where the setup on her floor was "segregated and racially divided." Id. ¶ 7. But the distinction is also one of job function: the service representatives (who were mostly African-American) were located in a different area than the sales representatives (who were mostly white). Id. And although Hawkins reports that Selzer screamed at her, she admits that he did so because problems at work that she should have addressed were being brought to his attention instead. Id. ¶ 15. Hawkins also complains of Selzer making racially insensitive comments, such as asking whether her (African-American) husband drank cognac. Id. ¶ 25. But, as with the others, this stray remark, even if racially motivated, is so far removed from Wainwright, DeJesus, and his termination, that it cannot undermine the Post's explanation for those events. Hence, the Court will deny as moot the Post's motion to strike the Hawkins affidavit.

---

[2] DeJesus does attempt to provide statistics demonstrating that discrimination at the Post is not merely anecdotal. He claims that, out of a set of fifty-six people forced to sign buy-outs at the Post between 2009 and 2011, forty-seven are African-American, and forty-eight are over forty years old. See Pl.'s Opp'n at 38. But there is no indication that the list of fifty-six people represents a complete (or even representative) set of all buy-outs at the Post in that time period. Rather, it is merely derived from the list of people DeJesus mentioned in his initial disclosures and interrogatory answers. See Pl.'s Exs. 11–13 [ECF No. 39-3]. Thus, the Court cannot draw any statistical conclusions from a potentially skewed set.

Ultimately, DeJesus delivered helpful information to a person of influence in his client's organization. To some, this would look like initiative. To Wainwright, it apparently looked like insubordination. Wainwright's decisions may seem like, or even be, poor management. Or a losing business strategy. Or unreasonable behavior. But those are her decisions—or the Post's—to make, right or wrong. "Title VII . . . does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation marks omitted). In the absence of sufficient evidence for a reasonable jury to find that the Post's non-discriminatory explanations were pretextual, the Court declines DeJesus's invitation to become just that.[3]

## CONCLUSION

For the foregoing reasons, the Court will grant the Post's motion for summary judgment and deny its motion to strike. A separate Order has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  September 29, 2015

---

[3] DeJesus has also brought a claim under 42 U.S.C. § 1981, arguing that the Post's treatment of him, including his termination, "depriv[ed him] of the making, performance, modification[,] and/or enjoyment of all benefits, privileges, terms and conditions of the contractual relationship governing his employment, at least in part" because of his race. Compl. [ECF No. 1] ¶ 34. Because courts use the same McDonnell Douglas framework in Title VII and section 1981 cases, see Brown v. Sessoms, 774 F.3d 1016, 1022 (D.C. Cir. 2014), this claim fails for the same reasons. Accordingly, the Court need not address whether DeJesus has standing to bring a section 1981 claim regarding his collective bargaining agreement.